1   Kristin Zilberstein, Esq., (SBN 20041)
    Jennifer R. Bergh, Esq., (SBN 305219)
2   LAW OFFICES OF MICHELLE GHIDOTTI
3   1920 Old Tustin Ave.
    Santa Ana, CA  92705
4   Tel: (949) 427-2010
    Fax:  (949) 427-2732
5   mghidotti@ghidottilaw.com

6
    Attorneys for Movant,
7   U.S. Bank Trust N.A., as Trustee of the Igloo Series III Trust, its successors and assigns

8

9               UNITED STATES BANKRUPTCY COURT

10        NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

11
    In Re:                          )   CASE NO.: 16-42400
12                                  )
    Emma J. Miles,                  )   CHAPTER 13
13                                  )
14          Debtor.                 )   REF.: MRG-1
                                    )
15                                  )   **DECLARATION IN SUPPORT OF**
                                    )   **MOTION FOR RELIEF FROM THE**
16                                  )   **AUTOMATIC STAY**
                                    )
17                                  )   DATE: November 7, 2018
18                                  )   TIME: 9:30 a.m.
                                    )   CTRM: 220
19                                  )   PLACE: U.S. Bankruptcy Court
20                                  )          1300 Clay Street
                                    )          Oakland, CA 94612
21                                  )
22                                  )   Honorable William J. Lafferty
                                    )
23                                  )
                                    )
24                                  )
                                    )
25                                  )
                                    )
26                                  )

27
28   / / /

                                    1
         DECLARATION IN SUPPORT OF MOTION FOR RELIEF FROM STAY

I, _____Raymond Valderrama_____, declare:

1. I am employed by BSI Financial Services, servicing agent for U.S. Bank Trust N.A., as Trustee of the Igloo Series III Trust ("**Movant**") as _Bankruptcy Supervisor_.

2. I make this declaration based upon the facts testified herein, all of which are in my personal knowledge, unless stated upon information and belief. As to the statements made upon information and belief, I believe them to be true. If called as a witness, I could and would competently testify thereto.

3. I am personally familiar with the books, records and files of Movant that pertain to loans and extensions of credit given to Debtor Emma J. Miles (hereinafter referred to as "**Debtor**") concerning the property commonly known as 5037 Winterglen Way, Antioch, CA 94531-8129 (the "**Property**"). I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the Court if required.

4. Debtor executed and delivered to GMAC Mortgage Corporation, that certain Interest First Adjustable Rate Note dated September 18, 2006, in the original principal amount of $350,000.00 (the "**Note**"). A true and correct copy of the Note is attached as Exhibit "1" and incorporated herein by reference.

5. Movant is the current owner of the Note and is in possession of the original Note.

6. Concurrently therewith, and as security for the Note, Debtor executed and delivered to GMAC Mortgage Corporation, a Deed of Trust which was recorded in the Official Records of Contra Costa County, California as Document No.: 2006-0335977-00 on October 19, 2006

(the **"Deed of Trust"**), and which encumbers the Property. A true and correct copy of the Deed of Trust is attached as Exhibit "2" and incorporated herein by reference.

7. Thereafter, all interests in the Deed of Trust were assigned to Movant by Assignment of Deed of Trust. A true and correct copy of each Assignment is attached hereto as Exhibit "3" and is incorporated herein by reference.

8. Pursuant to the Deed of Trust, Movant is entitled to recover attorneys' fees and costs in connection with the matter herein.

9. Pursuant to the Deed of Trust, Movant is entitled to take the necessary steps to protect its security interest in the Property, including advancing taxes, insurance, foreclosure fees and costs and attorney's fees and costs and to assess the costs plus interest, to the balance due under the loan.

10. Movant's loan is post-petition due for the February 1, 2018, payment and all subsequent payments as follows:

| | | |
|---|---|---|
| 09/01/2016-01/01/2018 | 17 Payments @ $1,413.22 | = $24,024.74 |
| 02/01/2018-09/01/2018 | 8 Payments @ $1,420.58 | = $11,364.64 |
| 10/01/2018 | 1 Payment @ $1,421.58 | = $1,421.58 |
| 08/01/2018 | $1,081.00 | = $1,081.00 |
| **Total** | | **= $37,891.96** |

11. Pursuant to Local Bankruptcy Rule 4001-1 (g)(1), a true and correct copy of an Account Statement outlining unpaid post-petition obligations is attached hereto as Exhibit "4" and incorporated herein by reference.

12. The current unpaid principal balance is no less than approximately $262,540.07.

13. The total owed to Movant is no less than approximately $416,972.78.

14. The Debtors' confirmed Chapter 13 Plan indicates the Debtor will make monthly mortgage payments to Movant. However, the Debtor is not current with his monthly mortgage payments to Movant and thus have failed to comply with the terms of his Chapter 13 Plan.

15. Movant have not been contacted by the Debtor regarding a loan modification.

1       16. Movant seeks relief from stay herein to proceed with its non-bankruptcy remedies

2 including, but not limited to, continuing its efforts to foreclose upon the Property, obtaining

3 possession of and selling the Property.

4       I declare under penalty of perjury under the laws of the United States of America that

5 the foregoing is true and correct and executed this ___11th___ day of _October_, 2018 at

6 _Irvine_____, _California_____.

# EXHIBIT "1"

# InterestFirst℠ ADJUSTABLE RATE NOTE

## (One-Year LIBOR Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| September 18, 2006 | Antioch | ,California |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

5037 Winterglen Way, Antioch, CA 94531-8129

*[Property Address]*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 350,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GMAC Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on November 1, 2006 . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on October 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79135, Phoenix, AZ, 85062-9135

or at a different place if required by the Note Holder.

**MULTISTATE InterestFirst ADJUSTABLE RATE NOTE -
One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3532 7/03**

*(Page 1 of 5)*    Initials: _____

GMACM-CNM.1812 (0411)

REDACTED

### (B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,005.21 before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of October, 2009 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 375/1000 percentage points ( 2.375 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 8.875 % or less than 4.875 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.875 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment after the first Change Date.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family - Fannie Mae Uniform Instrument Form 3632 7/03
GMACM-CNM.1812 (0411)  (Page 2 of 5)  Initials

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family - Fannie Mae Uniform Instrument Form 3532 7/03

GMACM-CNM.1912 (0411)

(Page 2 of 5)          Initials: _____

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3532 7/03
GMACM-CNM.1812 (04111)                (Page 4 of 5)

Initials:

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

PAY TO THE ORDER OF

WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

*Emma J Miles*
_____ (Seal)
Emma J. Miles                    -Borrower

*Vollmer*

J. Vollmer
Limited Signing Officer

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3532 7/03

GMACM-CNM.1812 (0411)                    (Page 5 of 5)

Investor Loan # 

**When Recorded Return To:**
iMortgage Services
2570 Boyce Plaza
Pittsburgh, PA 15241

This document was prepared by Green Tree Servicing LLC



——————— [SPACE ABOVE THIS LINE FOR RECORDING DATA] ———————

# LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), made this 30th day November, 2013, between EMMA J. MILES ("Borrower") and Green Tree Servicing LLC ("Lender"), amends and supplements 1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated 10/18/2006 and recorded on 10/19/2006 in Document# 2006033597700, of the Clerk-Recorder Records of Contra Costa County, CA and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

5037 WINTERGLEN WAY
ANTIOCH, CA 94531  See Exhibit A attached hereto and made a part hereof"

the real property described in the above-referenced Security Instrument.

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of 12/01/2013, the amount payable under the Note and the Security Instrument (the "New Principal Balance") is U.S. $381,844.31 consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. $113,894.31 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $267,950.00. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4.00000%, from 12/01/2013. Borrower promises to make monthly payments of principal and interest of U.S. $1,119.87, beginning on the 01/01/2014, and continuing thereafter on the same day of each succeeding month until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The yearly rate of 4.00000% will remain in effect until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The new monthly payment amount does not include any amounts owed for escrow. Borrower may refer to the monthly billing statement for the escrow amount owed. The new Maturity Date will be 12/01/2053. Borrower's payment schedule for the modified Loan is as follows:

REDACTED

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|
| 1-40 | 4.000% | 12/01/2013 | $1,115.87 | 01/01/2014 | 480 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

3. Borrower agrees to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and Security Instrument by the earliest of: (i) the date Borrower sells or transfers an interest in the Property, (ii) the date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

4. If Borrower makes a partial prepayment of Principal, Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

5. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

Borrower understands and agrees that:

(a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

REDACTED

(n) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

6. Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

7 Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

(a) all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and

(b) all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

A Borrower understands and agrees that:

(a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e) Borrower agrees to execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification.

LOAN MODIFICATION AGREEMENT Single Family Fannie Mae UNIFORM INSTRUMENT
REDACTED

In Witness Whereof, the Lender and I have executed this Agreement.

Green Tree Servicing LLC
Lender

By: _Wildame 12/26/13_

Brian A Abbee
Licensed Loss Mitigation Specialist
License Number: 68000

Borrower _Emma J. Miles_ (Seal)

Date _12-19-13_   EMMA J. MILES

_____ (Seal)
Borrower

Date
REDACTED

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.

_____ [SPACE BELOW THIS LINE FOR ACKNOWLEDGEMENT] _____

SEE ATTACHED CALIFORNIA
NOTARIAL CERTIFICATE

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of CONTRA COSTA

On /9th DEC. 2013 before me, SYED RAHMAN NOTARY PUBLIC
_Insert name and title of officer here_

personally appeared EMMA JOANNE MILES

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SYED RAHMAN
Commission # 1916163
Notary Public - California
Contra Costa County
My Comm. Expires Jan 6, 2015

(Notary Seal)

_Signature of Notary Public_

## INFORMATION BELOW IS RECOMMENDED BUT NOT REQUIRED

### TITLE/DESCRIPTION OF THE ATTACHED DOCUMENT

LOAN MODIFICATION AGREEMENT

DOCUMENT DATE 12/19/2013 _____ NUMBER OF PAGES 6

_Additional Information_

### CAPACITY CLAIMED BY SIGNER

□ Individual(s)  □ Partner(s)  □ Attorney-in-Fact  □ Trustee(s)

□ Corporate Officer _____  □ Other _____

2008 CA          www.NotaryAdvocate.com          V13.01.08

STATE OF Arizona

County of Maricopa

The foregoing instrument was acknowledged before me on December __26__, 2013 by Brian A.

Abbee of Green Tree Servicing LLC a corporation, on behalf of the corporation.

Julie A. B

Notary Public

Julie A. Butler
Notary Public
Maricopa County, Arizona
My Comm. Expires 06-17-15

Exhibit "A"

The land referred to in this policy is situated in the **STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA, CITY OF ANTIOCH**, and described as follows:

LOT 27, AS SHOWN ON THE MAP OF SUBDIVISION 6930, FILED SEPTEMBER 12, 1988 IN BOOK 325 OF MAPS, PAGE 11, CONTRA COSTA COUNTY RECORDS.

Parcel# 056-071-027



"END OF DOC"

# EXHIBIT "2"

Recording Requested By:
GMAC Mortgage Corporation

When recorded mail to:
First American Title Insurance
Lenders Advantage
1100 Superior Avenue, Suite 200
Cleveland, Ohio 44114
Attn: NRP Team



CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2006-0335977-00
Check Number
Thursday, OCT 19, 2006 11:02:00
MIC     $1.00|MOD     $20.00|REC     $24.00
TCF     $10.00|DAF     $1.00|REF     $0.20
TtI Pd  $56.00          Nbr-0003453178
                        rrc/RJ/1-2B

Prepared By:
Tarla Bernard

————————(Space Above This Line For Recording Data)————————

# DEED OF TRUST

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated 09/18/2006 together with all Riders to this document.

(B) "Borrower" is Emma J. Hiles, an unmarried woman

Borrower's address is 5037 Winterglen Way, Antioch, CA 94531-8129
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is
GMAC Mortgage Corporation
Lender is a Residential Mortgage Lender
organized and existing under the laws of Commonwealth of Pennsylvania

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3005  1/01

-6A(CA) (0207).01
Page 1 of 15                Initials: _Efm_
VMP Mortgage Solutions, Inc.

REDACTED

Lender's address is
7 Carnegie Plaza, Cherry Hill, NJ 08003
(D) "Trustee" is
Executive Trustee Services, Inc.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. ████████
(F) "Note" means the promissory note signed by Borrower and dated 09/18/2006
The Note states that Borrower owes Lender
Three Hundred Fifty Thousand                                                    Dollars
(U.S. $350,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2036
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider   [ ] Condominium Rider              [ ] Second Home Rider
[ ] Balloon Rider           [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider         [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

██████████████████████

⊕ -8A(CA) (0201).01                          Page 2 of 16          ▱▱ ℰ𝒻𝓂                 Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                     of Contra Costa

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

see attached legal description

Parcel ID Number: 056-071-027
5037 Winterglen Way                              which currently has the address of
Antioch                                                                   [Street]
("Property Address"):                        [City], California  94531-8129  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207) 01          Page 3 of 15                          Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

SA(CA) neelta

Page 4 of 15

Form 3005 1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



REDACTED
Case: 16-42400    Doc# 120-2    Filed: 10/19/18    Entered: 10/19/18 14:54:34    Page 24
of 47

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 -CA(CA) (0301).01

Page 5 of 15



Form 3005 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0317).01

Page 7 of 16

Form 3006   1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials *EJM*

Form 3006   1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Page 8 of 15

Form 3005 1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.


-6A/SA) (0307).01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Form 3005   1/01

Case: 16-42400   Doc# 120-2   Filed: 10/19/18   Entered: 10/19/18 14:54:34   Page 30 of 47

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Form 3005  1/01

REDACTED

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Thurman D. Dunn_

_Emma J. Niles_ _____ (Seal)
Emma J. Niles                        -Borrower

_____                    _____ (Seal)
                                                          -Borrower

_____ (Seal)            _____ (Seal)
                          -Borrower                        -Borrower

_____ (Seal)            _____ (Seal)
                          -Borrower                        -Borrower

_____ (Seal)            _____ (Seal)
                          -Borrower                        -Borrower

-6A(CA) (0207) 01                Page 14 of 15                Form 3005  1/01

State of California
County of CONTRA COSTA }ss.

On 9-18-06                          before me, THURMAN D. DUKE, Notary
                                                          personally appeared
GERALD J. MILES

                                                                    , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



THURMAN D. DUKE
COMM. # 1404877
NOTARY PUBLIC CALIFORNIA
SOLANO COUNTY
COMM. EXP. JUNE 24, 2008

ACTING IN CONTRA COSTA CO.

_____Valud_____ (Seal)

-BA(CA) material          Page 18 of 19          Form 3005 1/01

# ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 18      day of September     , 2006     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to GMAC Mortgage Corporation

                                        (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

5037 Winterglen Way, Antioch, CA 94531-8129

*[Property Address]*

> THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of    6.875      %. The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Date

The interest rate I will pay may change on the first day of   October 2009      , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits

MULTISTATE ADJUSTABLE RATE RIDER
WSJ One-Year LIBOR - Single Family - Fannie Mae
UNIFORM INSTRUMENT   Form 3189 6/01

*(Page 1 of 4)*

GMACM-CRM.1370 (06/04)      Initials: ___

REDACTED

in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 375/1000

percentage points ( 2.375      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.875            % or less than  4.875            %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
two                  percentage point(s) ( 2.000        %) from the rate of interest I have been paying for the preceding twelve months. My interest rate will never be greater than   12.875     %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE ADJUSTABLE RATE RIDER – WSJ One Year LIBOR – Single Family – Fannie Mae
UNIFORM INSTRUMENT   Form 3189   6/01
GMACM-CRM.1370 (06/04)                    (Page 2 of 4)                    Initials: _____

REDACTED

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS SPACE LEFT INTENTIONALLY BLANK

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One Year LIBOR – Single Family – Fannie Mae
UNIFORM INSTRUMENT   Form 3189   6/01
GMACM-CRM.1370 (06/04)                    (Page 3 of 4)            Initials:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Emma J. Miles_ _____ (Seal)
Emma J. Miles                                                 -Borrower

_____ (Seal)
                                                             -Borrower

_____ (Seal)
                                                             -Borrower

_____ (Seal)
                                                             -Borrower

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family - Fannie Mae UNIFORM INSTRUMENT  Form 3189  6/01

GMACM-CRM 1378 (06/04)                    (Page 4 of 4)

Form No. 3301 (6/00)
Short Form Commitment, EAGLE
EAGLE PLUS



ORDER NO:
FILE NO:
LENDER REF

### Exhibit "A"

The land referred to in this policy is situated in the STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA, CITY OF ANTIOCH, and described as follows:

LOT 27, AS SHOWN ON THE MAP OF SUBDIVISION 6830, FILED SEPTEMBER 12, 1988 IN BOOK 325 OF MAPS, PAGE 11, CONTRA COSTA COUNTY RECORDS.

APN # 056-071-027



End of Document

REDACTED

# EXHIBIT "3"

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY

Requested and Prepared by:
**Executive Trustee Services, LLC**

When Recorded Mail To:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
Burbank, CA 91504-3120
REDACTED

REDACTED

```
CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2011-0250811-00
Check Number
Thursday, NOV 17, 2011 11:03:00
MOD    $1.00:REC    $11.00:FTC    $0.00
DAF    $2.70:REF    $0.30:RED    $1.00
ERD    $1.00:
Ttl Pd    $17.00    Rcpt # 0001095798
```

## ASSIGNMENT OF DEED OF TRUST

**For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:**

**GMAC Mortgage, LLC (successor by merger to GMAC Mortgage Corporation)**

**all beneficial interest under that certain Deed of Trust dated: 09/18/2006 executed by EMMA J. MILES, AN UNMARRIED WOMAN, as Trustor(s), to EXECUTIVE TRUSTEE SERVICES, INC., as Trustee, and recorded as Instrument No. 2006-0335977-00, on 10/19/2006, in Book XX , Page XX of Official Records, in the office of the County Recorder of Contra Costa County, CA together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.**

**DATE:**  11/7/11

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., ("MERS") AS NOMINEE FOR
GMAC MORTGAGE CORPORATION its
successors and assigns

Charles Moreno  *ASSISTANT SECRETARY*

State of Texas } SS.
County of Dallas }

On November 7th, 2011 before me, Jorie Fazio, Notary Public, personally appeared Charles Moreno who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of  Texas  that the foregoing paragraph is true and correct.

**WITNESS** my hand and official seal.

Signature _____ (Seal)

JORIE FAZIO
Notary Public, State of Texas
My Commission Expires
February 03, 2015

**[RECORDING REQUESTED BY]**
**NATIONWIDE TITLE CLEARING**

**[AND WHEN RECORDED MAIL TO]**
Green Tree Servicing LLC
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

REDACTED



CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
**DOC- 2013-0169808-00**
Check Number
Friday, JUL 05, 2013 13:56:09
MOD    $1.00:REC    $11.00:FTC    $0.00
DAF    $2.70:REF    $0.30:RED    $1.00
ERD    $1.00:              :
Ttl Pd    $17.00    Rcpt # 0001720219

# CORPORATE ASSIGNMENT OF DEED OF TRUST

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned,**GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, WHOSE ADDRESS IS 1100 VIRGINIA DR, FORT WASHINGTON, PA, 19034-3200, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Deed of Trust, without recourse, representation or warranty, together with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon to **GREEN TREE SERVICING LLC, WHOSE ADDRESS IS 7360 SOUTH KYRENE RD, T314, TEMPE, AZ 85283 (800)643-0202, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).**

Said Deed of Trust made by **EMMA J. MILES** and recorded on 10/19/2006 as Instrument # 2006-0335977-00, in Book , Page in the office of the CONTRA COSTA County Recorder, CA.

**Dated on** _____ / ____ /2013 (MM/DD/YYYY)
**GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, by GREEN TREE SERVICING LLC, its Attorney-in-Fact**

By: _____
     Daniel Thompson
     **VICE PRESIDENT**

All Authorized Signatories whose signatures appear above are employed by NTC and have reviewed this document and supporting documentation prior to signing.

## ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on _____ / ____ /2013 (MM/DD/YYYY), by Daniel Thompson as VICE PRESIDENT for GREEN TREE SERVICING LLC as Attorney-in-Fact for GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Nicole Baldwin EE 222285
Notary Public State of FLORIDA
Commission expires: 08/05/2016

Nicole Baldwin
Notary Public State of Florida
My Commission # EE 222285
Expires August 5, 2016

Document Prepared By: E.Lance/NTC. 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING, INC.

[AND WHEN RECORDED MAIL TO]
Neuberger Berman Investment Advisers, LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683



CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk – Recorder
**DOC– 2017-0126093-00**
Check Number
Friday, JUL 14, 2017 12:31:57
MOD  $1.00 REC  $11.00 FTC  $0.00
DAF  $2.70 REF  $0.30 RED  $1.00
ERD  $1.00
Ttl Pd  $17.00    Nbr-0002970445
MSN / RD / 1-1

## CORPORATE ASSIGNMENT OF DEED OF TRUST

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **DITECH FINANCIAL LLC F/K/A GREEN TREE SERVICING LLC, WHOSE ADDRESS IS 2100 E. ELLIOT RD., TEMPE, AZ 85284, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Deed of Trust, without recourse, representation or warranty, together with all rights, title and interest secured thereby, all liens, and any rights due or to become due thereon to **PROF-2013-S3 LEGAL TITLE TRUST IV, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE, WHOSE ADDRESS IS 60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107 (800)934-6802, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Deed of Trust made by **EMMA J MILES** and recorded on 10/19/2006 as **Doc # 2006-0335977-00** in the office of the **CONTRA COSTA** County Recorder, **CA**. Modification: DATED: 6/1/2012, REC: 9/20/2012, INST: 2012-0231083-00 Modification: DATED: 11/30/2013, REC: 1/28/2014, INST: 2014-0013925-00

Dated on ___6 / 29___ /2017 (MM/DD/YYYY)
**DITECH FINANCIAL LLC F/K/A GREEN TREE SERVICING LLC**

By: _____
Jennifer Moylan
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on ___6 / 29___ /2017 (MM/DD/YYYY), by Jennifer Moylan as VICE PRESIDENT of DITECH FINANCIAL LLC F/K/A GREEN TREE SERVICING LLC, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Nicole Baldwin GG 004850
Notary Public - State of FLORIDA
Commission expires: 08/05/2020

NICOLE BALDWIN
Notary Public - State of Florida
My Comm. Expires August 5, 2020
Commission # GG004850

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

REDACTED

Recording Requested by Simplifile

Prepared By and Return To:
Kathleen Collins
Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

20189005775500002
CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
DOC 2018-0057755-00
Acct 1710-Meridian Asset Services Inc
Monday, APR 16, 2018 09:00:43
SB2 $75.00|MOD $2.00|REC $12.00
FTC $1.00|DAF $2.70|REF $0.30
RED $1.00|ERD $1.00|
Ttl Pd $95.00 Nbr-0003187837
kat/RC/1-2

Space above for Recorder's use

REDACTED                    REDACTED

## ASSIGNMENT OF DEED OF TRUST

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **PROF-2013-S3 LEGAL TITLE TRUST IV, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE**, whose address is **60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107**, (ASSIGNOR), does hereby grant, assign and transfer to **US BANK TRUST N.A., AS TRUSTEE OF THE IGLOO SERIES III TRUST**, whose address is **7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain deed of trust, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Deed of Trust: **9/18/2006**
Original Loan Amount: **$350,000.00**
Executed by (Borrower(s)): **EMMA J. MILES**
Original Trustee: **EXECUTIVE TRUSTEE SERVICES, INC.**
Original Beneficiary: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR GMAC MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**
Filed of Record: In Book N/A, Page N/A,
Document/Instrument No: **2006-0335977-00** in the Recording District of **CONTRA COSTA, CA**, Recorded on **10/19/2006**.

Property more commonly described as: **5037 WINTERGLEN WAY, ANTIOCH, CALIFORNIA 94531-8129**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: _3/12/2018_

**PROF-2013-S3 LEGAL TITLE TRUST IV, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE, BY PRESTON RIDGE PARTNERS III, LLC, ITS ATTORNEY-IN-FACT**

By: **SCOTT GILBERT**                    Witness Name: _Jases Barons_
Title: **MANAGER**

REDACTED

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of _Arizona_

County of _Maricopa_

On _March 12, 2018_, before me, _Wendy Starr_, a Notary Public, personally appeared **SCOTT GILBERT, MANAGER of/for PRESTON RIDGE PARTNERS III, LLC, AS ATTORNEY-IN-FACT FOR PROF-2013-S3 LEGAL TITLE TRUST IV, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE,** personally known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of _Arizona_ that the foregoing paragraph is true and correct. I further certify SCOTT GILBERT, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

_(signature)_

(Notary Name): _Wendy Starr_
My commission expires: _June 22, 2018_

WENDY STARR
Notary Public · Arizona
Maricopa County
My Commission Expires
June 22, 2018

REDACTED

# EXHIBIT "4"


**BSI Financial Services**

| Payment Changes | | | |
|---|---|---|---|
| Date | P&I | Escrow | Total |
| POC | $1,119.87 | $423.25 | $1,543.12 |
| 9/1/2016 | $1,119.87 | $293.35 | $1,413.22 |
| 2/1/2018 | $1,119.87 | $300.71 | $1,420.58 |
| | | | |
| | | | |
| | | | |

| Loan Information | |
|---|---|
| Loan # | ☐☐☐ |
| Borrower | Miles |
| Date Filed | 8/25/16, 16 42400 |
| First Post Petition | |
| Due Date | 9/1/2016 |
| POC Covers | 4/2015 - 8/2016 |

146554

| Date | Amount Rcvd | Post Pet Due Date | Contractual Due Date | Amt Due | Over/Short | Suspense Credit | Suspense Debit | Suspense Balance | POC Arrears Credit | POC Debit | POC Suspense Balance | POC Paid to Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/16/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $593.77 | | $593.77 | $593.77 | |
| 6/13/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $3,031.55 | | $3,625.32 | $3,625.32 | |
| 6/27/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $467.45 | | $4,092.77 | $4,092.77 | |
| 7/11/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.86 | | $4,553.63 | $4,553.63 | |
| 8/3/2017 | | pre applied | 4/1/2015 | | $0.00 | | | $0.00 | | $1,543.12 | $3,010.51 | $4,553.63 | |
| | | pre applied | 5/1/2015 | | $0.00 | | | $0.00 | | $1,543.12 | $1,467.39 | $4,553.63 | |
| 8/4/2017 | | pre applied | 6/1/2015 | | $0.00 | | | $0.00 | | $1,543.12 | -$75.73 | $4,553.63 | |
| | | pre applied | 7/1/2015 | | $0.00 | | | $0.00 | | $1,543.12 | -$1,618.85 | $4,553.63 | |
| 8/8/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.85 | | -$1,158.00 | $5,014.48 | |
| 11/6/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $483.79 | | -$674.21 | $5,498.27 | |
| 11/8/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.85 | | -$213.36 | $5,959.12 | |
| 11/29/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.85 | | $247.49 | $6,419.97 | |
| 11/29/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $483.79 | | $731.28 | $6,903.76 | |
| 11/29/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.85 | | $1,192.13 | $7,364.61 | |
| 12/11/2017 | | trustee arrears | | | $0.00 | | | $0.00 | $460.86 | | $1,652.99 | $7,825.47 | |
| 1/10/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $460.86 | | $2,113.85 | $8,286.33 | |
| 1/26/2018 | | pre applied | 8/1/2015 | | $0.00 | | | $0.00 | | $1,543.12 | $570.73 | $8,286.33 | |
| 2/7/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $460.85 | | $1,031.58 | $8,747.18 | |
| 4/6/2018 | | pre applied | 9/1/2015 | | $0.00 | | | $0.00 | | $621.41 | $410.17 | $8,747.18 | |
| 5/7/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $512.17 | | $922.34 | $9,259.35 | |
| 6/5/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $1,130.22 | | $2,052.56 | $10,389.57 | |
| 7/10/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $1,129.18 | | $3,181.74 | $11,518.75 | |
| 8/7/2018 | | trustee arrears | | | $0.00 | | | $0.00 | $1,168.19 | | $4,349.93 | $12,686.94 | |
| 9/7/2018 | | pre applied | 10/1/2015 | | $0.00 | | | $0.00 | | $1,543.13 | $2,806.80 | $12,686.94 | |
| 10/7/2018 | | pre applied | 11/1/2015 | | $0.00 | | | $0.00 | | $1,543.13 | $1,263.67 | $12,686.94 | |
| | | | | | $0.00 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | | | $0.00 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| Due | | | 9/1/2016 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 10/1/2016 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 11/1/2016 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 12/1/2016 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 1/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 2/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 3/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 4/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 5/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 6/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 7/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 8/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 9/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 10/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 11/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 12/1/2017 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 1/1/2018 | $1,413.22 | -$1,413.22 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 2/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 3/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 4/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 5/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 6/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 7/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 8/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 9/1/2018 | $1,420.58 | -$1,420.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | 9/2/2018 | $1,421.58 | -$1,421.58 | | | $0.00 | | | $1,263.67 | $12,686.94 | |
| | | | | | $0.00 | | | $0.00 | | | $1,263.67 | $12,686.94 | |